IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

_____

No. 6:20-CV-29-REW

_____

IN RE: AMERICORE HOLDINGS, LLC, *et al.*

COMMONWEALTH OF PENNSYLVANIA,

Appellant,

vs.

CAROL FOX, AS CHAPTER 11 TRUSTEE OF THE DEBTORS; AMERICORE
HOLDINGS, LLC; AMERICORE HEALTH, LLC; AMERICORE HEALTH
ENTERPRISES, LLC; ELLWOOD MEDICAL CENTER, LLC; ELLWOOD
MEDICAL CENTER REAL ESTATE, LLC; and ELLWOOD MEDICAL
CENTER OPERATIONS, LLC,

Appellees.

_____

APPEAL FROM THE JUDGMENT OF THE UNITED STATES
BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF KENTUCKY
ENTERED ON JANUARY 24, 2020

_____

**INITIAL BRIEF OF APPELLEES**

_____

Baker & Hostetler LLP
Andrew V. Layden, Esq.
Tiffany Payne Geyer, Esq.
P.O. Box 112
Orlando, FL 32802
(407) 649-4000

*Attorneys for Carol Fox, as Chapter 11 Trustee of the Debtors*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Federal Rule of Bankruptcy Procedure 8012, Carol Fox, as Chapter 11 Trustee of the above-captioned debtors (the "Trustee" and "Debtors," respectively), states that she is an individual, and thus not subject to Rule 8012. However, in an abundance of caution, the Trustee discloses the following corporate ownership interests for the Debtors, as identified in the Debtors' respective bankruptcy schedules:

No publicly held corporation owns 10% or more of any of the Debtors' stock.

Americore Holdings, LLC is owned 100% by Americore Capital, LLC.

Americore Health, LLC is owned: 20% by MOSC Enterprises, LLC; 1% by White Management, Inc.; and 79% by Americore Holdings, LLC.

Americore Health Enterprises, LLC is owned 100% by Americore Health LLC.

Ellwood Medical Center, LLC is owned 100% by Americore Health Enterprises, LLC.

Ellwood Medical Real Estate, LLC is owned 100% by Americore Health Enterprises, LLC.

Ellwood Medical Center Operations, LLC is owned 100% by Ellwood Medical Center, LLC.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUES AND ..................................................2

THE APPLICABLE STANDARDS OF REVIEW ....................................2

STATEMENT OF THE CASE.............................................................3

     A.     Pre-Bankruptcy Background ...............................................3

     B.     Americore and EMC Seek Bankruptcy Protection. ...........................4

     C.     The Commonwealth's Emergency Motions. ........................5

     D.     The Bankruptcy Court Hearing on the Emergency Motions. ...............6

     E.     The Bankruptcy Court Denies the Emergency Motions Without Prejudice. ..........................................................11

     F.     The Bankruptcy Court Appoints an Independent Fiduciary as Chapter 11 Trustee to Take Over the Debtors' Reorganization. ........13

SUMMARY OF THE ARGUMENT ....................................................15

ARGUMENT ..............................................................................16

I.     THE BANKRUPTCY COURT DID NOT COMMIT AN ABUSE OF DISCRETION IN DETERMINING THAT "CAUSE" DID NOT EXIST TO MODIFY THE AUTOMATIC STAY..................................................16

II.     THE BANKRUPTCY COURT CORRECTLY APPLIED APPLICABLE LAW AND FOUND THAT THE STATE COURT LAWSUIT WAS NOT EXCEPTED FROM THE AUTOMATIC STAY UNDER THE NARROW POLICE AND REGULATORY POWERS EXCEPTION. ............................................................................19

     A.     Exceptions to the Automatic Stay are Narrowly Construed. ..............19

i

B.      The Bankruptcy Court Properly Applied the Public Policy Test.........21

C.      The Bankruptcy Court Properly Applied the Pecuniary Purpose
        Test. ...........................................................................................26

CONCLUSION .......................................................................................29

CERTIFICATE OF SERVICE ...............................................................30

# <u>TABLE OF AUTHORITIES</u>

Cases ........................................................................................................Page(s)

*In re Automotive Professionals, Inc.*,
    370 B.R. 161 (Bankr. N.D. Ill. 2007) ...........................................................27, 28

*Caffey v. Bowers*,
    140 S. Ct. 39, 205 L. Ed. 2d 37 (2019) .............................................................10

*Central Trust Co. N.A. v. Mr. D. Realty Co. (In r Mr. D Realty Co.)*,
    27 B.R. 359 (Bankr. S.D. Ohio 1983) ...............................................................20

*Chao v. Hospital Staffing Servs., Inc.*,
    270 F.3d 374 (6th Cir. 2001) ....................................... 15, 17, 21, 22, 23, 24, 29

*In re Corporacion de Servicios Medicos Hospitalarios de Fajardo*,
    805 F.2d 440 (1st Cir. 1986)..............................................................................28

*In re Dougherty-Kelsay*,
    601 B.R. 426 (Bankr. E.D. Ky. 2019) ...............................................................20

*In re Elrod*,
    523 B.R. 790 (Bankr. W.D. Tenn. 2015)...........................................................20

*In re First Energy Solutions Corp.*,
    945 F.3d 431 (6th Cir. 2019) ...............................................................21, 23, 24

*Garzoni v. K-Mart Corp. (In re Garzoni)*,
    35 F. App'x 179 (6th Cir. 2002) (unpublished)....................................................2

*Laguna Assocs. Ltd P'ship v. Aetna (In re Laguna Assocs. Ltd.
    P'ship)*,
    30 F.3d 734 (6th Cir. 1994) .........................................................................2, 18

*Landrum v. Anderson*,
    813 F.3d 330 (6th Cir. 2016) ............................................................................18

*In re McKenzie*,
    737 F.3d 1034 (6th Cir. 2013) ..........................................................................18

*In re Miller*,
    513 F. App'x 566 (6th Cir. 2013) (unpublished)................................................17

*In re Montgomery*,
    525 B.R. 682 (Bankr. W.D. Tenn. 2015).............................................................20

*Nicole Gas Prod., Ltd.*, 916 F.3d 566, 570 (6th Cir. 2019).....................................10

*In re Nierzwicki Holdings, LLC*,
    544 B.R. 136 (Bankr. E.D. Ky. 2015).............................................................17

*In re Nortel Networks, Inc.*,
    669 F.3d 128 (3d Cir. 2011).......................................................................20, 21

*Ohio v. Kovacs*,
    469 U.S. 274, 105 S. Ct. 705 (1985)................................................................26

*Penn Terra Ltd. v. Dept. of Environmental Resources*,
    733 F.2d 267 (3d Cir. 1984).........................................................................20

*Ritzen Group, Inc. v. Jackson Masonry, LLC*,
    140 S. Ct. 582 (2020)....................................................................................1

*In re Royal*,
    137 F. App'x 537 (4th Cir. 2005) (unpublished).................................................21

*S.E.C. v. Brennan*,
    230 F.3d 65 (2d Cir. 2000).........................................................................21

*Stieg v. Hanson (In re Stieg)*,
    509 B.R. 148 (Bankr. S. D. Ohio 2014)...........................................................20

*In re United Imps., Inc.*,
    203 B.R. 162 (Bankr. D. Neb. 1996)...............................................................17

*United States v. Robinson*,
    494 B.R. 715 (W.D. Tenn. 2013).....................................................................3

*In re Verity Health System of California, Inc.*,
    598 B.R. 283 (Bankr. C.D. Cal. 2018).............................................................26

*Watervliet Paper Co., Inc. v. City of Watervliet (In re Shoreham Paper Co.)*,
    117 B.R. 274 (Bankr. W.D. Mich. 1990)..........................................................20

iv

**Statutes**

11 U.S.C. § 101 ................................................................................2

11 U.S.C. § 363(b) .......................................................................11, 25

11 U.S.C. § 363(f)(1), (2), (5) ..............................................................25

11 U.S.C. § 364(b)(4) ...........................................................................3

11 U.S.C. §§ 541, 362 .........................................................................16

Bankruptcy Code § 362(b)(1) .................................................................3

Bankruptcy Code § 362(b)(4) ................................. 2, 3, 9, 21, 22, 23, 24, 27, 28, 29

Bankruptcy Code § 362(d)(1) ...................................................2, 13, 17, 19

Bankruptcy Code § 507(a)(4) ................................................................5

Bankruptcy Code § 1129(a)(9)(B) ..........................................................5

## STATEMENT OF JURISDICTION

This is an appeal of an order entered by the United States Bankruptcy Court for the Eastern District of Kentucky (the "Bankruptcy Court") denying, without prejudice, the emergency motion of Appellant, the Commonwealth of Pennsylvania ("Commonwealth"), seeking a determination that the automatic stay did not apply to its pre-petition lawsuit against the Debtors, or alternatively, requesting relief from the automatic stay. (Doc. No. 7-15)[1] (the "Emergency Stay Order"). For purposes of this appeal, the Trustee does not contest the Commonwealth's assertion that the Emergency Stay Order is immediately appealable. *See e.g. Ritzen Group, Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582 (2020).

---

[1] All Doc. No. references refer to this Court's docket unless otherwise stated. Bankruptcy court docket entries will be cited as "Bankr. Doc. No."

## STATEMENT OF THE ISSUES AND
## THE APPLICABLE STANDARDS OF REVIEW

1.     Did the Bankruptcy Court abuse its discretion in denying, without prejudice, the Commonwealth's emergency motion for relief from the automatic stay seeking relief from the automatic stay for "cause" under § 362(d)(1) of the Bankruptcy Code[2] to continue its pre-petition litigation against the Debtors seeking to transfer ownership of one of the Debtors' primary assets?

2.     Did the Bankruptcy Court commit reversible error in denying, without prejudice, the Commonwealth's emergency motion for a finding that the narrowly-construed exception to the automatic stay under § 362(b)(4) of the Bankruptcy Code applied to its pre-petition litigation against the Debtors seeking to transfer ownership of one of the Debtors' primary assets?

As to the first issue, "[t]he decision whether or not to lift the automatic stay resides within the sound discretion of the bankruptcy court. Accordingly, [the appellate court reviews] the question for an abuse of discretion." *Garzoni v. K-Mart Corp. (In re Garzoni)*, 35 F. App'x 179, 181 (6th Cir. 2002) (unpublished); *See also Laguna Assocs. Ltd P'ship v. Aetna (In re Laguna Assocs. Ltd. P'ship)*, 30 F.3d 734, 737 (6th Cir. 1994) (court of appeals reviews bankruptcy court's order granting or denying relief from the automatic stay only for abuse of discretion).

---

[2] All references herein to the "Bankruptcy Code" refer to 11 U.S.C. §§ 101 *et seq.*

As to the second issue, the decision of whether the Commonwealth's request to continue pre-petition litigation against the Debtors fell within the narrowly-construed exception to the automatic stay under § 362(b)(4) of the Bankruptcy Code is a question of law that is reviewed *de novo. United States v. Robinson*, 494 B.R. 715, 718 (W.D. Tenn. 2013) (reviewing § 362(b)(1) finding on a de novo basis).

## STATEMENT OF THE CASE

### A.      Pre-Bankruptcy Background

In March 2017, Americore Health, LLC ("Americore") and Ellwood Medical Center, LLC ("EMC") entered into an asset purchase agreement ("APA") with Ellwood City Hospital ("ECH") (Doc. No. 7-3, 7-4). Under the APA, Americore and EMC acquired ECH's real estate, equipment, and receivables, and took over operation of the hospital (the "Hospital"). For years prior to the APA, ECH was losing in excess of $4 million dollars per year, and if not for the proposed APA, the Hospital would have been closed as quickly as possible and all assets would have been liquidated. (Doc. No. 7-5, p. 3).

In September 2017, the parties obtained judicial approval of the proposed APA by the Court of Common Pleas of Lawrence County, Orphans' Court Division (the "State Court" and "Order Approving APA") (Doc. No. 7-5). As relevant here, the Order Approving APA required Americore and ECH to continue operating the Hospital for ten years. (Doc. No. 7-5, ¶ 3). The transaction closed shortly thereafter.

Unfortunately, due to continuing operating and financial issues over the subsequent years, the Hospital was forced to stop serving patients in December 2019. The Hospital kept some office personnel in charge of billing and medical records, and it retained custodial services to maintain and secure the buildings (Bankr. Doc. No. 11, ¶ 9). On December 23, 2019, the Commonwealth filed a Petition to Enforce Asset Purchase Agreement and for Monetary Damages in the State Court ("State Court Lawsuit") (Doc. Nos. 7-3, 7-4). The State Court Lawsuit sought multiple remedies including: (i) divesting Americore and EMC of all legal and equitable ownership rights in the Hospital; (ii) ordering Americore and EMC to pay outstanding debts, including any outstanding wages, unemployment compensation taxes, or pension contributions; (iii) compelling Americore and EMC to provide an accounting of financial expenditures from September 2017 through December 2019; and (iv) directing Americore and EMC to pay the Commonwealth's costs. (*Id.*).

## B.    Americore and EMC Seek Bankruptcy Protection.

On December 31, 2019, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "Bankruptcy Cases").[3] As is typical, the Bankruptcy Court entered an order (i) authorizing the

---

[3] The case numbers and entity names for each of the Debtors are as follows: Case Nos. 19-61605 (Pineville Medical Center, LLC), 19-61606 (Americore Health Enterprises, LLC), 19-61607 (Americore Health, LLC), 19-61608 (Americore Holdings, LLC), 19-61609 (Success Healthcare 2, LLC), 19-61610 (St. Alexius Hospital Corporation #1), 19-61611 (St. Alexius Properties, LLC), 19-61612 (Izard County Medical Center, LLC), 19-61613 (Ellwood Medical Center, LLC), 19-61614 (Ellwood Medical Center Real Estate, LLC), and 19-61615 (Ellwood Medical Center Operations, LLC). The Bankruptcy Cases are being jointly administered under Case No. 19-61608.

4

Debtors to continue operating their respective businesses subject to the duties imposed by the Bankruptcy Code, (ii) barring the Debtors from making any payment on prepetition unsecured debts (including priority unsecured debts such as past due wages);[4] and (iii) enjoining the Debtors from using, selling, or leasing any property other than in the ordinary course of business, except after notice and hearing before the Bankruptcy Court. (Bankr. Doc. No. 5).

As set forth in the First Day Affidavit of the Debtors' CEO, the Debtors' core focus was to purchase distressed hospitals in underserved communities, including hospitals that needed a financial turnaround. (Bankr. Doc. No. 11, ¶ 5). As of the bankruptcy petition date, the Debtors owned and operated three hospitals and two entities that held receivables related to hospitals the Debtors previously sold. (*Id.*) The Debtors' goal was to use the bankruptcy process to sell certain assets and/or reorganize around their better-performing businesses with the support of the Debtors' key creditor constituencies. (*Id.*).

### C.    The Commonwealth's Emergency Motions.

Shortly after the Bankruptcy Court's "first day hearing" on a number of motions typically filed at the beginning of a Chapter 11 case, on January 14, 2020, the Commonwealth appeared in the Bankruptcy Cases and immediately filed three

---

[4] Absent bankruptcy court approval, the Bankruptcy Code generally prevents debtors from using post-petition assets to pay pre-petition debts until a Chapter 11 plan is confirmed. Many unpaid employee wages are "priority" claims under § 507(a)(4) of the Bankruptcy Code, and the Chapter 11 plan must propose to pay them in full in order to be confirmable under § 1129(a)(9)(B) of the Bankruptcy Code.

motions: (i) an Emergency Motion for Determination that the Automatic Stay Does Not Apply, or in the Alternative, for Relief from the Automatic Stay ("Emergency Stay Motion"); (ii) an emergency motion to compel the Debtors to pay certain pre-petition debts (the "Emergency Motion to Compel"), and (iii) a Motion to Shorten Time to Respond and Set Hearing on Emergency Motions (Bankr. Doc. Nos. 84-86, respectively).

The Bankruptcy Court scheduled a hearing on the Emergency Motion to Compel and Emergency Stay Motion for January 17, 2020 (just three days after the motions were filed). The Debtors objected to the Emergency Stay Motion on the basis that the State Court Lawsuit, rather than an exercise of "police and regulatory power," constituted an effort to enforce a pre-petition contract against the Debtors, recover monetary damages, and involuntarily transfer critical assets away from the Debtors' bankruptcy estates at the inception of their restructuring. (Doc. No. 10-2).

**D.    The Bankruptcy Court Hearing on the Emergency Motions.**

On January 17, 2020, the Bankruptcy Court heard oral argument on the Emergency Stay Motion and the Emergency Motion to Compel, providing both parties with a full and fair opportunity to raise its arguments. A transcript of the hearing is attached as Exhibit A to the Appellees' Appendix.[5]

---

[5] The Appendix is being filed simultaneously with the Appellees' Initial Brief.

The Commonwealth acknowledged that its State Court Lawsuit could not continue as currently framed because it was clearly an attempt to collect a pre-bankruptcy debt against the Debtors in violation of the automatic stay (*Id.* at 9:4 through 10:5, 35:15-22). The Commonwealth offered to amend its pleadings to eliminate the request for monetary damages, but retain its effort to undo the Order Approving APA, thus taking away one of the Debtors' most significant assets that could allow it to reorganize in the Bankruptcy Cases (*Id.* at 10:17-24, 11:11-25).

The Commonwealth argued that the State Court was the appropriate forum to consider how assets would be redistributed or whether the assets could be used in the Bankruptcy Cases. (*Id.* at 11:19-25, 16:17-19). In response, the Bankruptcy Court asked why these traditionally bankruptcy court functions should not be part of Chapter 11 plan or sale process in the Bankruptcy Cases:

> Why wouldn't that be something that we would consider in the bankruptcy court as the debtor moves forward with a plan of reorganization or a sale or something like that?

(*Id.* at 12:1-5). The Commonwealth responded that the distribution of assets and potential re-opening "…would all need to be addressed and the place for that to be appropriately addressed would be the [State Court] because they could oversee and administer and determine the best approach and the way to deliver that health care…" (*Id.* at 13:1-6). The Bankruptcy Court also stated that while ordering an entity to reopen a hospital that has been shut down is outside its authority and that if

the healthcare regulatory authority in Pennsylvania wanted to stop the opening of a hospital "they could certainly have the authority to do that," those were not the circumstances present in these Bankruptcy Cases because the Debtors were not operating the Hospital and did not have the financial ability to immediately reopen it. (*Id.* at 13:7-18).

The Commonwealth acknowledged that both the Bankruptcy and State Court would lack authority to require the financially challenged Debtors to reopen the Hospital, stating that the question was "what the impact of that is." (*Id.* at 14:7-11). That determination could involve taking control over the Debtors' assets and determining the appropriate distribution of those assets: "[i]f the reorganization is successful, and its successful in that the assets would be sold, where would the assets be distributed?" (*Id.* at 14:20-22). The Commonwealth argued that the State Court, rather than the Bankruptcy Court, should dictate how the assets would be distributed because the Debtors should not be allowed to sell the hospital assets "…and then have those assets available for other purposes through the reorganization of the estate" in a bankruptcy process. (*Id.* at 15:6-8). The Commonwealth argued it would violate applicable Pennsylvania law if the Debtors in bankruptcy could alter their pre-bankruptcy obligations to operate in a certain way "if in fact now they're just saying it got too expensive, I can't do it anymore." (*Id.* at 15:17-18).

The Debtors confirmed that there was no financial ability to immediately reopen the Hospital (which is what prompted the Bankruptcy Cases), but emphasized that one of the primary purposes of the bankruptcy reorganization is to stay pre-petition litigation to consolidate matters into a single forum for resolution (including whether an how assets of a bankruptcy estate should be distributed), and the effect of a State Court decision would be to determine the distribution of the *res* of the bankruptcy estate and could result in creditors receiving "no monetary reimbursement." (Transcript, 22:17-22, 23:7-9, 26:24-27:3).

The Debtors correctly noted that in the healthcare context, § 362(b)(4) issues typically arises when a regulatory authority seeks to oversee the *ongoing* provision of healthcare services. (*Id.*). Those circumstances were not before the Bankruptcy Court: the question here was whether the Commonwealth should be allowed to continue the State Court Lawsuit against the Debtors in an attempt to take title to bankruptcy estate assets because of the Debtors' pre-bankruptcy failure to comply with the APA, and this "directly conflict[s] with the control of the res or property of the bankruptcy court…" (*Id.* at 24:4-6, 25:7-10).

The Debtors further argued that bankruptcy courts are frequently asked to interpret or effectuate prior orders like the Order Approving APA, including determining issues such as (i) whether obligations should be discharged, (ii) whether orders require turnover of estate property, (iii) whether covenants or obligations run

with the land, and (iv) whether orders or other documents demonstrate competing liens or title (*Id.* at 28:11-24). Accordingly, to the extent the Bankruptcy Court did not deny the Emergency Motions outright, the Debtors asked the Bankruptcy Court to deny the Motions without prejudice to allow time for the Debtors' operations to stabilize in the new bankruptcy environment.[6] While the Commonwealth voiced concerns that the Debtors' assets could be distributed in bankruptcy in a way that is inconsistent with the Order Approving APA (*Id.* at 14:18-25), the Bankruptcy Court appropriately questioned why its oversight and protection of estate assets did not resolve those issues. (*Id.* at 17:16 through 18:2). Specifically, the Bankruptcy Code prohibits debtors from selling or distributing *any assets* outside of the ordinary course of business without parties being entitled to notice and an opportunity to object (*Id.* at 31:14-20); *see also* 11 U.S.C. § 363(b).

The Commonwealth also referenced a potential misuse of estate assets. (*Id.* at 15:19 through 16:19). However, as the Bankruptcy Court identified and as subsequently happened in this case, a debtor in possession may be removed and a Chapter 11 Trustee, like Ms. Fox, appointed to address any concerns about a debtor in possession's ability to operate the businesses. (*Id.* at 40:24 through 41:4).

---

[6] The Bankruptcy Code provides several protections to debtors seeking relief and subjecting themselves to bankruptcy court oversight. Fundamental to those protections is the automatic stay, which generally stays creditor actions so the debtors can stabilize their operations and propose a plan of reorganization. *Nicole Gas Prod., Ltd.*, 916 F.3d 566, 570 (6th Cir. 2019), cert. denied sub nom. *Caffey v. Bowers*, 140 S. Ct. 39, 205 L. Ed. 2d 37 (2019) ("The policy imperative behind the automatic stay is to 'give[ ] the debtor a breathing spell from creditors and stop[ ] foreclosure actions, collection efforts, and creditor harassment.'").

At the hearing, the Commonwealth conceded this is a "very factually dependent" analysis, and "there is no on-point directly analogous precedent." (*Id.* at 36:6-7). Understanding this is a factually dependent issue, at the close of the hearing, the Bankruptcy Court explained why it was leaning toward denying the Commonwealth's emergency motions without prejudice to the Commonwealth re-filing the motions as the cases developed:

> Now regarding the motion to pay the wages, the debtors' hands are tied. … [T]he debtors cannot pay pre-petition claims. … The grant of stay relief is much more difficult. … It does appear to be a breach of contract type claim. If I granted the relief, multiple parties would be affected, not just the Commonwealth of Pennsylvania, not just the debtor. … This is the type of issue it seems to me the bankruptcy court is set up to deal with where we have everybody … in one court. … There are ways to deal with [potential misuse of assets] that you can remove a debtor in possession, but that is done with evidence. … The comment that I take to heart which is my problem with whether or not this is an exception is whether it is public policy versus public safety. This isn't a situation, we've had it in this Court where I am extremely concerned for patient care. … What I really think this is … is premature. I believe that these arguments that you're making could be very well taken … if there was a proposed sale or proposed reorganization. So I understand what you're asking and that's why to me this is not well-taken today. … [I]t's simply premature to give you the relief that you're requesting, and that's why … I don't think it precludes you from requesting similar relief at a later point in the case when the facts have changed. …

(*Id.* at 39-42).

### E.     The Bankruptcy Court Denies the Emergency Motions Without Prejudice.

After taking the emergency motions under advisement, the Bankruptcy Court (i) entered an order denying the Emergency Stay Order and (ii) entered an order

denying the Emergency Motion to Compel (Bankr. Doc. No. 132). In the Emergency

Stay Order, the Bankruptcy Court made the following findings:

> This is not a matter of public safety. The hospital is closed and there is no evidence that immediate harm may befall the residents at this time. Forcing the hospital to reopen and make payments of certain debts (*e.g.* payroll) would give the Attorney General and the creditors a pecuniary advantage inconsistent with the fair distribution concepts in the Bankruptcy Code. Further, the relief sough requires expending funds to operate the hospital or turnover of a valuable asset of the bankruptcy estate. This relief is pecuniary in nature.

> The action also fails the public policy test. The request for enforcement of a contract or damages for its breach (by divestiture of the asset or money damages) is a request to adjudicate the private rights of the citizens of Lawrence County and not a matter of public policy.

> The Attorney General also raised the risk of misuse of charitable assets. It is fair to protect charitable funds, but more is required than a mere fear that a debtor could misuse the assets. The Attorney General is encouraged to maintain vigilance and bring any issues of this nature to the attention of the Court at any time.

(Doc. No. 7-15). The Bankruptcy Court also found "cause" did not exist to grant

relief from the automatic stay under § 362(d)(1). Significantly, the Bankruptcy

Court's ruling was "without prejudice to the movant's right to raise the same or

similar issues if the facts change or are further developed over time." (*Id.*).

Thereafter, the Commonwealth filed its notice of appeal of the Emergency Stay

Relief Order (Bankr. Doc. No. 161). In the approximately nine months since the

Bankruptcy Court entered the Emergency Stay Order, the Commonwealth has not

renewed its Emergency Stay Motion.

**F.     The Bankruptcy Court Appoints an Independent Fiduciary as Chapter 11 Trustee to Take Over the Debtors' Reorganization.**

On February 20, 2020, pursuant to an agreement between the Debtors and various other parties, the Bankruptcy Court entered an agreed order directing the appointment of an independent fiduciary as Chapter 11 trustee in place of the Debtors' existing management (Bankr. Doc. No. 258). Thereafter, Ms. Carol Fox was appointed as the Chapter 11 trustee (the "Trustee") and approved by the Bankruptcy Court. (Bankr. Doc. Nos. 260, 270, 352).[7]

In this appeal, the parties agreed to, and the Court approved, multiple extensions of time for the Trustee to file her response brief while the Trustee continued efforts to identify and consummate a sale of Americore and EMC's assets to a responsible party that would re-start operations at the Hospital. (Doc. Nos. 9, 11, 15-22).

Since her appointment, the Trustee has taken over operations to stabilize the Bankruptcy Cases. The Trustee is working diligently to continue and improve patient care at operating facilities, and market the hospitals to responsible operators who can restore stable and effective healthcare to the communities where the hospitals are located. Specifically, with respect to the Hospital, the Trustee and the Commonwealth have been in regular communication throughout the Bankruptcy

---

[7] On March 23, 2020, the Trustee substituted in this appeal in her capacity as Trustee (Doc. No. 11).

Cases. The Trustee, in her business judgment, has elected to pursue a sale of substantially all the assets of Americore and EMC to maximize the value of those assets for all stakeholders and to ensure the facility continues to serve as a healthcare provided in the local community.

There is a preliminary agreement between the Trustee and a purchaser for the Hospital, Pelorus Equity Group Inc. ("Pelorus"). The Trustee and Pelorus are in the process of finalizing an asset purchase agreement. The Commonwealth has provided certain conditions to operating the Hospital, and Pelorus has agreed to those conditions, which are included in the asset purchase agreement. While the Trustee anticipated that a sale motion would have been filed and heard by the Bankruptcy Court by October 30, 2020 (*See* Doc. No. 21, ¶¶ 2-4), the transaction has been slowed by the COVID-19 pandemic and the additional administrative burdens of re-starting operations at a previously-closed healthcare facility. The Trustee remains optimistic that a transaction will be consummated soon transferring the Hospital assets to Pelorus or another purchaser with the Commonwealth's approval. The Trustee understands, however, that the Commonwealth is unwilling to consent to future delays of this appeal, and accordingly, files this initial brief in support of the Bankruptcy Court's Emergency Stay Relief Order.

## SUMMARY OF THE ARGUMENT

The Bankruptcy Code's purpose is to provide debtors with a path to reorganize their financial affairs and give the debtors "second chance" by permitting the discharge of certain pre-petition debts, and the automatic stay is fundamental to that process. *Chao v. Hospital Staffing Servs., Inc.*, 270 F.3d 374, 383 (6th Cir. 2001). As a practical matter, granting emergency stay relief at the inception of these bankruptcy cases would have jeopardized or ended the Debtor's potential reorganization before it substantively began.

As to the Commonwealth's emergency request for relief from stay for "cause," the record is clear that the Bankruptcy Court properly applied applicable law and did not commit an abuse of discretion in doing so. As to the Commonwealth's emergency request for a determination that the State Court Lawsuit fell within the narrow police powers exception to the automatic stay, the Bankruptcy Court appropriately applied the Sixth Circuit's well-established "public policy" and "pecuniary purpose" tests to determine that the exception did not apply here.

The Commonwealth's State Court Lawsuit did not satisfy the public policy test because, at its core, it sought remedies for the Debtors' alleged pre-petition breach of the APA, sought to take title to the *res* of the bankruptcy estate, and was substantively about "who gets what" and in what priority from the insolvent debtor.

Similarly, the State Court Lawsuit did not satisfy the pecuniary interest test because requiring the Debtors to make certain payments or turnover valuable assets of the bankruptcy estate was pecuniary in nature, especially considering that the Hospital ceased operating before the bankruptcy cases. As set forth herein, the Trustee believes the Bankruptcy Court's decision was well reasoned and appropriate under the circumstances of this case and should be affirmed.

## ARGUMENT

## I. THE BANKRUPTCY COURT DID NOT COMMIT AN ABUSE OF DISCRETION IN DETERMINING THAT "CAUSE" DID NOT EXIST TO MODIFY THE AUTOMATIC STAY.

Filing a petition under the Bankruptcy Code creates a bankruptcy estate generally consisting of all the debtor's legal or equitable interests in property, and results in the imposition of a broad automatic stay of proceedings against the debtor and its property. 11 U.S.C. §§ 541, 362. The purpose of the automatic stay is to protect debtors and creditors by preventing a "race to the courthouse" to seize the debtor's assets in uncoordinated proceedings in different courts, and instead require creditors to act through the bankruptcy process, which implements an orderly reorganization or liquidation and distribution of estate assets in accordance with the priorities set forth in the Bankruptcy Code. *Chao*, 270 F.3d at 383.

Parties in interest may seek relief from automatic stay "for cause." 11 U.S.C. § 362(d)(1). "Cause" is not defined in the Bankruptcy Code, and bankruptcy courts

16

decide "whether discretionary relief is appropriate on a case-by-case basis." *In re Miller*, 513 F. App'x 566, 575 (6th Cir. 2013). In determining whether cause exists to grant relief from the automatic stay to continue pre-petition litigation, courts consider: "(1) judicial economy; (2) trial readiness; (3) the resolution of preliminary bankruptcy issues; (4) the creditor's chance of success on the merits; and (5) the cost of defense or other potential burden to the bankruptcy estate and the impact of the litigation on other creditors." *In re Nierzwicki Holdings, LLC*, 544 B.R. 136, 138 (Bankr. E.D. Ky. 2015) (citing *In re United Imps., Inc.*, 203 B.R. 162, 166 (Bankr. D. Neb. 1996)).

It is critical that bankruptcy courts be given broad discretion to implement the automatic stay to prevent hyperactive creditors from continuing the "race to the courthouse" and defeating the Bankruptcy Code's overarching goals of providing debtors with a financial "fresh start." Because of the discretionary nature of determining whether "cause" exists, the decision is reviewed on appeal only for an abuse of discretion. *In re Laguna Assocs. Ltd. P'ship*, 30 F.3d at 737.

A trial court commits an "abuse of discretion" only where the appellate court has "a definite and firm conviction that the trial court committed a clear error of judgment." *Landrum v. Anderson*, 813 F.3d 330, 334–35 (6th Cir. 2016). In other words, an abuse of discretion only occurs "if no reasonable person could agree with

the bankruptcy court's decision." *In re McKenzie*, 737 F.3d 1034, 1038 (6th Cir. 2013) (internal citations omitted).

In this case, the Bankruptcy Court's decision that "cause" did not exist for relief from the automatic stay was correct and did not constitute an abuse of discretion. The hearing transcript and Emergency Stay Order demonstrate that the Bankruptcy Court carefully considered the relevant factual and legal information presented when reaching its decision. Specifically, the Bankruptcy Court considered (i) the increased costs associated with the continuing proceedings in multiple venues and the risk of distracting from the debtor's goal of an ultimate resolution (Transcript, 19:12-18, 41:15-42-8); (ii) the Commonwealth's fear that without the State Court Lawsuit the Debtor could improperly direct charitable assets to a non-charitable use without the Commonwealth having the ability to contest it (*Id.* at 17:16-18:2, 40:22-41:4); (iii) the effect of relief from stay on other parties in interest, including the other creditors in these Bankruptcy Cases (*Id.* at 40:15-18); and (iv) what the Bankruptcy Court ultimately found was the "premature" timing of the Commonwealth's Emergency Stay Motion (*Id.* at 41:15-42:8).

There is simply no evidence that the Bankruptcy Court's ultimate conclusion that the Commonwealth's arguments were "insufficient to constitute cause to grant from the automatic stay at this time" was improper, the subject of a "clear error in judgment" or that "no reasonable person could agree with the bankruptcy court's

decision." Accordingly, this Court should affirm the Bankruptcy Court's decision to deny the Commonwealth's request for relief from the automatic stay under § 362(d)(1) for cause.

## II. THE BANKRUPTCY COURT CORRECTLY APPLIED APPLICABLE LAW AND FOUND THAT THE STATE COURT LAWSUIT WAS NOT EXCEPTED FROM THE AUTOMATIC STAY UNDER THE NARROW POLICE AND REGULATORY POWERS EXCEPTION.

The police and regulatory powers exception to the automatic stay, like all other exceptions to the automatic stay, must be narrowly construed. The Bankruptcy Court properly denied, without prejudice, the Commonwealth's emergency attempt to seize the Debtors' non-operating Hospital, which was one of their primary assets at the inception of the Bankruptcy Cases.

### A. Exceptions to the Automatic Stay are Narrowly Construed.

Exceptions to the automatic stay are construed narrowly, and for good reason. The bankruptcy court's orderly administration of estate property is "at the very heart of the automatic stay"[8] and facilitates a successful reorganization. *Central Trust Co. N.A. v. Mr. D. Realty Co. (In r Mr. D Realty Co.)*, 27 B.R. 359, 364 (Bankr. S.D. Ohio 1983) ("In a Chapter 11 context, the purpose of the automatic stay … is not an end in itself, but rather to facilitate reorganization."). Allowing parties to easily surpass the bankruptcy court's orderly administration of estate property would

---

[8] *In re Elrod*, 523 B.R. 790, 796 (Bankr. W.D. Tenn. 2015).

eviscerate the purpose of the automatic stay. *See In re Dougherty-Kelsay*, 601 B.R. 426, 442 (Bankr. E.D. Ky. 2019) (quoting 3 Collier on Bankruptcy ¶ 362.05 (Alan R. Resnick & Henry J. Sommer eds., 16th ed. 2019) ("It is well settled that '[e]xceptions to the stay should be read narrowly.'").[9]

Contrary to the substantial weight of authority within the Sixth Circuit, the Commonwealth urges this Court to "broadly construe" the police powers exception and cites to the Third Circuit's opinion in *Penn Terra* for this proposition (Doc No. 6, p. 13) (citing *Penn Terra Ltd. v. Dept. of Environmental Resources*, 733 F.2d 267, 273 (3d Cir. 1984)). However, the Third Circuit itself cautioned against this interpretation in its later *Nortel Networks* decision, stating that its "broad" interpretation of the exception in *Penn Terra* was limited to federal-state preemption questions related to environmental hazards. *In re Nortel Networks, Inc.,* 669 F.3d 128, 140 (3d Cir. 2011). Contrary to the Commonwealth's assertion that a "broad" reading of § 362(b)(4) is appropriate, the Third Circuit expressly clarified that "the legislative history *expressly* supports a narrow construction of the police power exception." *Id.* at 140 n.13 (emphasis added). In addition to *Nortel Networks*, the more-recent and better-reasoned authority suggests the § 362(b)(4) exception should

---

[9] *See also In re Montgomery*, 525 B.R. 682, 693 (Bankr. W.D. Tenn. 2015) ("These exceptions are narrowly written and strictly construed."); *Stieg v. Hanson (In re Stieg)*, 509 B.R. 148, 152 (Bankr. S. D. Ohio 2014) ("The exceptions to the automatic stay are narrowly construed to ensure fair and equal treatment among all creditors."); *Watervliet Paper Co., Inc. v. City of Watervliet (In re Shoreham Paper Co.)*, 117 B.R. 274, 281 (Bankr. W.D. Mich. 1990) ("[a]cknowledging that statutory exceptions to the automatic stay are to be narrowly interpreted and in accordance with the stay's underlying rationale").

be read narrowly.[10] Just like all other exceptions to the fundamental protections of the automatic stay, the police powers exception must be strictly construed, and the Court should reject the Commonwealth's arguments to the contrary.

To decide whether an action falls within the police powers exception, courts in the Sixth Circuit applies the "public policy" test and "pecuniary purpose" test. *In re First Energy Solutions Corp.*, 945 F.3d 431, 446 (6th Cir. 2019). "Under the public policy test, reviewing courts must distinguish between proceedings that adjudicate private rights and those that effectuate public policy. Those proceedings that effectuate a public policy are excepted from the stay." *Chao*, 270 F.3d at 385-86 (internal citations omitted). "Under the pecuniary purpose test, reviewing courts focus on whether the governmental proceeding relates primarily to the protection of the government's pecuniary interest in the debtor's property, and not to matters of public safety. Those proceedings which relate primarily to matters of public safety are excepted from the stay." *Id.* at 385 (internal citations omitted).

**B.     The Bankruptcy Court Properly Applied the Public Policy Test.**

In this case, the Bankruptcy Court correctly applied the public policy test and concluded that the Commonwealth's attempt to seize the Debtors' primary asset

---

[10] *See e.g. In re Royal*, 137 F. App'x 537, 541 (4th Cir. 2005) ("In other words, the legislative history supports the plain language of the statute indicating that we should treat the Section 362(b)(4) exception narrowly...") (unpublished); *S.E.C. v. Brennan*, 230 F.3d 65, 75 (2d Cir. 2000) ("Section 362(b)(4) carves out a limited exception to" the Bankruptcy Code's policies of centralizing "all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.").

consisted of a "request for enforcement of a contract or damages for its breach (by divestitures of the assets or money damages)," was primarily a request to adjudicate private rights, and was not a matter of public policy. (Doc. No. 7-15, p. 3).

The Sixth Circuit's decision in *Chao* supports the Bankruptcy Court's finding. *Chao*, 270 F.3d at 378. In *Chao*, the United States Secretary of Labor sued to prevent the distribution of business records created by workers that had not been fully paid for their work. *Id.* The Secretary of Labor argued that enforcing provisions of the Fair Labor Standards Act fell under § 362(b)(4) because it effectuated the public policy of protecting businesses against unfair competition and enforcing federal minimum wage laws. *Id.* at 388. The court stated that while all regulatory lawsuits necessarily effectuate public policy to some extent, the court's role is to weigh the varying interests and identify suits that should "nevertheless be regarded as largely in furtherance of private interests" *Id.* at 389. The Sixth Circuit noted that in performing the analysis, "many cases will be close," but "when the action incidentally serves public interests but more substantially adjudicates private rights, courts should regard the suit as outside the police power exception, particularly when a successful suit would result in a pecuniary advantage to certain private parties vis-à-vis other creditors of the estate, contrary to the Bankruptcy Code's priorities." *Id.* The Sixth Circuit concluded that the Secretary of Labor's lawsuit served primarily to adjudicate private rights, and thus was not subject to the police powers exception.

The Sixth Circuit's later decision of *FirstEnergy Solutions Corp.* also supports the Bankruptcy Court's ruling. 945 F.3d at 447. In that case, the Sixth Circuit applied the reasoning in *Chao* to the Federal Energy Regulation Commission's (FERC) assertion that its regulatory and oversight functions over electricity-purchase contracts were primarily designed to pursue public policy within the meaning of § 362(b)(4). *Id.* The Court weighed Congress's goals of protecting energy markets and consumers in enacting the Federal Power Act compared to Congress's goals in permitting liberal restructuring in the Bankruptcy Code. *Id.* at 451. The Court recognized that "to be effective, restructuring must also be expeditious and possibly unfair or harmful to other concerned parties, even including the general public. It would not be reasonable in all cases to permit public interest concerns to overrule a restructuring decision…." *Id.* Ultimately, the Sixth Circuit did not disturb the bankruptcy court's finding that FERC's action "would 'only incidentally serve public interests but more substantially adjudicate private rights.'" *Id.* at 448. As the bankruptcy court noted, "the action would be litigating who gets what from the insolvent enterprise." *Id.* at 447.[11]

The same reasoning applies here and supports the Bankruptcy Court's decision. Similar to *Chao*, the Commonwealth's goal in the State Court Litigation

---

[11] The Sixth Circuit agreed that the bankruptcy court was correct in determining that the anticipated action by FERC of ordering contract performance would fail the public policy test, but it ultimately found the bankruptcy court went too far in issuing its injunction against *any* FERC action. *In re First Energy Solutions Corp.*, 945 F.3d at 449.

was to seek a remedy for the Debtors' pre-petition actions–here seeking an involuntary transfer of the Debtors' assets away from the Bankruptcy Court's jurisdiction, which would result in distributions not being made in accordance with the Bankruptcy Code's priorities. *Chao*, 270 F.3d at 389. In fact, the Commonwealth argued at the hearing that asset distribution issues should be determined by the State Court rather than the Bankruptcy Court, demonstrating that, like *FirstEnergy*, the State Court Lawsuit was largely about "who gets what from the insolvent enterprise" and in what priority. *In re First Energy Solutions Corp.*, 945 F.3d at 447. The Bankruptcy Court appropriately weighed the competing interests under the Sixth Circuit's standard set forth in *Chao*.[12] Ultimately, while there may be long-term public policy reasons for the Commonwealth's actions, there was no need to modify the automatic stay on an emergency basis to pursue that policy at the expense of the Debtors and its creditors.

At the hearing, the Committee also argued that the police powers exception applied because the Debtors may seek to use the assets for non-charitable purposes in violation of applicable Pennsylvania law, and the State Court should conduct proceedings about "what [the Debtors] intend to do with the health care facility" and

---

[12] For the avoidance of doubt, the Commonwealth acting under its *parens patriae* powers does not demonstrate it is acting for a "public policy" reason within the meaning of section 362(b)(4). *See e.g. SCBA Liquidation, Inc.* 489 B.R. 666, 682 (Bankr. W.D. Mich. 2013) (finding that attorney general acting under *parens patriae* power on behalf of consumers to enforce consumer protection laws were the "precise type of government action described by the Sixth Circuit as falling outside the police powers exception to the automatic stay.").

how "charitable assets could either be redistributed or whether the charitable assets could be used through the debtor's reorganization…" (Transcript, 11:20-23; 14:10-11; 14:18-25; 15:1-18; 16:11-19).

The Bankruptcy Court correctly found this argument was fundamentally misplaced and premature. (*Id.* at 41:15-25 through 42:1-3; Doc. No. 7-15, p. 3). At the time of the emergency hearing, the Debtors had not proposed any sale or reorganization of the hospital assets and could not effectuate any such without Bankruptcy Court approval. (Transcript, 12:1-5). The Bankruptcy Code prohibits a debtor from consummating any transaction "outside the ordinary course of business" without notice and a hearing, and further prohibits the debtor's transfer of property "free and clear" of an interest in such property unless (i) applicable nonbankruptcy law permits sale of such property free and clear of such interest, (iii) the entity consents, or (iii) the entity could be compelled to accept a money satisfaction of such interest. 11 U.S.C. § 363(b); 11 U.S.C. § 363(f)(1), (2), (5) (prohibiting transfer "free and clear" except in certain circumstances). In other words, the Commonwealth's position that Pennsylvania law prohibits the transfer of charitable assets to non-charitable uses was expressly preserved in the bankruptcy process (Transcript, 17:22-18:2). This explains the Bankruptcy Court's inquiry into why the bankruptcy

process would not protect the Commonwealth in the interim period pending a proposed sale or reorganization. (*Id.*).[13]

### C.     The Bankruptcy Court Properly Applied the Pecuniary Purpose Test.

The Bankruptcy Court also appropriately found that the Commonwealth's actions were not primarily a matter of public safety but instead were pecuniary in nature. (Doc. No. 7-15, p. 2). It is undisputed that the Hospital was closed, and the Debtors lacked the financial ability to immediately reopen it. (Transcript, 14:7-11, 21:24 through 22:1). The question was not whether the Hospital should reopen, but whether the automatic stay temporarily shielded the Debtors from litigating over ownership of the Hospital in the State Court pending their effort to reorganize under the Bankruptcy Code. The Bankruptcy Court correctly found that forcing the Debtors to immediately reopen the Hospital and pay certain debts (which they could not afford to do) or "turnover a valuable asset of the bankruptcy estate" was pecuniary in nature. (Doc. No. 7-15, p. 2). This conclusion is well reasoned and supported by the record and applicable caselaw.

---

[13] To be clear, the Trustee does not concede that the obligations under the Order Approving APA cannot be modified under the Bankruptcy Code. *See e.g. Ohio v. Kovacs*, 469 U.S. 274, 279, 105 S. Ct. 705, 708 (1985) (finding the right to performance on a court order can be a claim discharged in a bankruptcy case); *In re Verity Health System of California, Inc.*, 598 B.R. 283 (Bankr. C.D. Cal. 2018) (finding that pre-petition conditions imposed by a pre-petition restructuring agreement approved by the California Attorney General were an interest in property and allowing the debtors to sell the hospitals free and clear of those conditions). Regardless, it is the Bankruptcy Court, rather than the State Court, that should determine the effect the Bankruptcy Cases have on the Debtors' obligations under the Order Approving APA. Indeed, as the Debtors noted at the hearing, bankruptcy courts frequently interpret the effect of the Bankruptcy Code on state law obligations. (Transcript, 28:11-24). The Bankruptcy Court agreed that it could resolve these competing-title and claim issues (Transcript, 32:17-20, 40:19-22).

The case of in *In re Automotive Professionals, Inc.* is instructive. 370 B.R. 161 (Bankr. N.D. Ill. 2007). In that case, the court found that the police powers exception did not apply to the State of Illinois exercising its regulatory authority to conduct a liquidation proceeding of a debtor-insurer during a bankruptcy case. *Id.* The court reasoned that federal bankruptcy laws exist to "centralize the process of distributing the debtor's estate among its creditors," and allowing parallel proceedings would "defeat the fundamental purpose of the Bankruptcy Code." *Id.* at 183. The Court described common situations in which § 362(b)(4) would apply to include preventing or stopping violations of "fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws," but not "regulatory laws that directly conflict with the control of the res or property by the bankruptcy court." *Id.* at 183-84. Like the Emergency Stay Order, the *Automotive Professionals* court expressly relied on the fact that "the debtor ceased conducting business…before it filed for bankruptcy" to support its conclusion that the state was not acting to protect health, welfare, or safety. *Id.* at 184.

The Commonwealth argues that the Bankruptcy Court erred in considering that the facility was closed, and by doing so, the Bankruptcy Court implicitly required the Commonwealth to present evidence of "immediate harm." (Doc. No. 6, p. 15). From that erroneous assumption, the Commonwealth makes the uncontested

argument that it was not required to prove imminent harm in order to fall within the scope of § 362(b)(4).

The Commonwealth misinterprets the Bankruptcy Court's decision. The Emergency Stay Order simply does not require evidence of immediate harm. Rather, the fact that the Hospital was closed and was not providing healthcare services is just one part of the Bankruptcy Court's analysis in determining the Commonwealth's primary motivation—and it is a valid consideration. *See e.g. In re Automotive Professionals*, 370 B.R. at 184 (relying on debtor's pre-petition closure of business to support holding that state's actions did not fall within § 362(b)(4) exception). Additionally, at the hearing, the Commonwealth stated that its "secondary interest if not the primary interest" was to ensure that parties could not use the bankruptcy process to convert charitable assets to a non-charitable use based on financial difficulties. (Transcript, 20:13-18; 27:13-20). In other words, the Commonwealth's explicit goal was to revoke the APA and retake title to the assets due to the Debtors' pre-petition failure to perform. This is a pecuniary function, and the Bankruptcy Court did not err in concluding as much. *See e.g. In re Corporacion de Servicios Medicos Hospitalarios de Fajardo,* 805 F.2d 440, 445 (1st Cir. 1986) (finding that § 362(b)(4) did not apply to a regulator's lawsuit to revoke a debtor's contract to

operate a hospital as it threatened to deprive the debtor of its principal asset and jeopardized its opportunity to reorganize).[14]

## CONCLUSION

For the reasons stated above, the Trustee respectfully requests that this Court affirm the Bankruptcy Court's Emergency Stay Order.

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQIREMENTS

This brief complies with Bankruptcy Rule 8015's typeface, type-style, and page limitation requirement.

DATED: October 30, 2020.

Respectfully submitted,

*s/Andrew Layden*
Andrew V. Layden
Florida Bar No. 86070
Tiffany Payne Geyer
Florida Bar No. 421448
BAKER & HOSTETLER LLP
2300 SunTrust Center
200 South Orange Avenue
Post Office Box 112
Orlando, Florida 32802
Telephone: 407-649-4000
Telecopier: 407-841-0168
Email: alayden@bakerlaw.com

---

[14] For the avoidance of doubt, the Trustee disagrees with the Commonwealth's assertion that it does not have a pecuniary interest. (Doc. No. 6, p. 14). In *Chao*, the Sixth Circuit found that the United States Secretary of Labor did not have a pecuniary interest because she would not gain title to the assets nor a money judgment against the debtors. *Chao*, 270 F.3d at 388. Similarly, in *FirstEnergy*, the Sixth Circuit found that FERC did not have a pecuniary interest was it was acting in a purely regulatory capacity. Here, in contrast, the Commonwealth is acting on behalf of the parties that could benefit more from the re-conveyance of the Debtors' assets than they would under the Bankruptcy Code.

tpaynegeyer@bakerlaw.com
*Attorneys for the Chapter 11 Trustee*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 30, 2020, the foregoing *Initial Brief of Appellees* was filed electronically with this Court and will be available for viewing and downloading from the Court's Electronic Case Filing System.

<u>*s/Andrew V. Layden*</u>
Andrew V. Layden